UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

**2016 APR 22  PM 4: 30**

CLERK

BY_____
DEPUTY CLERK

JUDY HIRAMOTO,                                    )
                                                 )
            Plaintiff,                           )
                                                 )
      v.                                         )   Case No. 5:14-cv-142
                                                 )
GODDARD COLLEGE CORPORATION,                     )
                                                 )
            Defendant.                           )

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT**
(Doc. 40)

Plaintiff Judy Hiramoto alleges that in terminating her employment, Defendant
Goddard College Corporation unlawfully retaliated against her and discriminated against
her on the basis of her Japanese national origin in violation of the Vermont Fair
Employment Practices Act ("VFEPA"), 21 V.S.A. § 495(a)(1). Pending before the court
is Defendant's motion for summary judgment (Doc. 40), which Plaintiff opposes. After
oral argument, the court took the motion under advisement on January 12, 2016.

Plaintiff is represented by Norman E. Watts, Jr., Esq. Defendant is represented by
Jonathan D. Persky, Esq., Joseph P. McConnell, Esq., and Colin K. McNeil, Esq.

**I.    The Undisputed Facts.**

**A.    The Role of Faculty Advisors.**

Defendant is an educational institution that offers several low-residency[1]
undergraduate and graduate programs, including a Masters of Fine Arts in
Interdisciplinary Arts Program ("MFAIA Program"). Defendant's faculty is represented
by the Goddard College Faculty Union ("GCFU"), an affiliate of the United Auto
Workers. Defendant does not offer any tenured positions to its faculty.

---

[1] Defendant's low-residency model "combines on-campus and individualized, independent
learning from students' home communities." (Doc. 40-3 at 2, ¶ 2.)

For the first eight days of each semester, students and faculty interact in-person during an "intensive residency[.]" (Doc. 40-3 at 2, ¶ 2.) Students receive their faculty advisor assignments at this time and, with the assistance of their faculty advisors, develop study plans for the semester. Defendant considers students' preferences when making faculty advisor assignments, but also requires students in the MFAIA Program to work with at least three different faculty advisors throughout their five-semester course of studies.

For the remainder of each semester, students interact with their faculty advisors through online communications and postal mail. Five times per semester, students send their faculty advisors "packets" of materials that document their progress. Faculty advisors are expected to respond to students' packets promptly, in writing, and with tailored, detailed, and personal feedback. The exchange of packets and feedback is intended to facilitate a meaningful dialogue regarding students' performance.

Throughout each semester, MFAIA students are expected to demonstrate progress toward degree criteria.[2] Faculty advisors submit narrative evaluations of their advisees at

---

[2] In the MFAIA Program, there are seven degree criteria that students must satisfy to graduate:

[1.] A Fully Developed Personal Practice[;] . . .

[2.] Ability to Conduct Rigorous Exploration within the Context of an Art Practice[;] . . .

[3.] Practicum[,] . . . [which] reflects a tradition of practical education within graduate study[,] . . . [and] is most often completed through a classroom teaching experience, in preparation for an academic career[;] . . .

[4.] Understanding of the Nature of Art and Articulation of a Personal Theory of Art[;] . . .

[5.] Ability to Develop Critical Discourse on One's Own and Other's Practice[;] . . .

[6.] Understanding of the Concept of Interdisciplinary Art[; and] . . .

[7.] Understanding of the Cultural, Social, and Political Context of One's Art Practice[.]

(Doc. 40-23 at 8.)

2

the end of each semester, noting whether the students progressed in the completion of degree criteria.

Prior to graduation, each student also receives an evaluation of their overall performance in the MFAIA Program. This evaluation is conducted by the faculty advisor supervising the student's final semester and an additional faculty advisor who reviews the student as a "second reader[.]" (Doc. 40-23 at 12.) As part of this evaluation, the faculty advisor and second reader consider the student's prior semester evaluations. Thereafter, "the faculty advisor and the second reader each prepare a final transcript statement which evaluates the student's graduate work as a whole[,] . . . [and] along with the student's [self-evaluation], these two faculty evaluations replace the in-progress semester evaluations as the student's official transcript." *Id.*

## B.   The Evaluation of Faculty Advisors.

Faculty advisors report to Program Directors, who, in turn, report to the Chief Academic Officer and Academic Dean. Program Directors conduct formal evaluations of faculty advisors. The procedure, frequency, and criteria for conducting faculty advisor evaluations are determined in the collective bargaining process. Pursuant to Defendant's 2009-2012 collective bargaining agreement, as modified by a Side Letter Agreement signed in April 2011, newly hired faculty advisors receive one-year term appointments and annual evaluations. After three years of successful service, faculty advisors may obtain three-year term appointments based upon positive evaluations at the end of each three-year term. After nine years of service and a successful "comprehensive review," faculty advisors may transition to five-year term appointments. An unsuccessful comprehensive review results in termination.

During the first nine years of employment, each faculty advisor evaluation is conducted by the Program Director and two peer reviewers.[3] In advance of those

---

[3] The Program Director and the two peer reviewers consider the following materials when conducting an evaluation: the faculty member's self-assessment and résumé; the faculty member's responses to two students' packets, as well as the faculty advisor's final evaluations of these students from the most recent semester; all student evaluations of the faculty member since

3

evaluations, the faculty member is notified which peer reviewers will conduct the evaluation, and the faculty member has an opportunity to request different peer reviewers. It is unclear whether this permits a faculty member to hand-pick his or her peer reviewers.

During the first nine years of faculty employment, evaluators consider "the performance of the faculty member and the staffing, fiscal, programmatic and curricular needs of the College[.]" (Doc. 40-20 at 14.) Among other things, evaluators assess whether faculty advisors "[g]uide students in developing self-direction, while challenging them to further growth[,]. . . . [g]ive timely, appropriate, and individualized feedback to students, and consider feedback from them[,] . . . [and] [e]valuate students fairly, submitting timely, thoughtful, and well-written narrative evaluations to students[.]" *Id.* at 8-9.

As part of their assessments, the peer reviewers submit written comments to the Program Director. The Program Director thereafter incorporates the peer reviewers' feedback into a final evaluation. In the final evaluation, the Program Director recommends whether the faculty advisor should be reappointed. The Chief Academic Officer, in turn, accepts or rejects the Program Director's recommendation.

During their ninth year of employment, faculty members undergo a comprehensive review, which is an "evaluation of a higher standard[.]" *Id.* at 15.[4] The comprehensive review is conducted by a committee that includes the Program Director, a "vice chair," and two peer reviewers.[5] The 2009-2012 collective bargaining agreement describes the comprehensive review as follows:

---

the previous evaluation; all staff or administrative evaluations of the faculty member; evaluations from outside sources (if the faculty member submits them); and any other relevant materials.

[4] The Side Letter Agreement provides that the comprehensive review procedure shall be implemented in 2011, that it "will typically be started in the first semester of the [eighth] year of service with the evaluation file due to the committee by the end of that semester[,]" and that this schedule applies to all faculty members, regardless of any previous evaluation schedule. (Doc. 40-27 at 2.)

[5] Because the "vice chair" had the same responsibilities as the peer reviewers, this position is hereinafter included in the term "peer reviewer."

> The ninth year evaluation . . . include[s] all of the standard elements of
> faculty evaluations[,] . . . but the breadth of the review will necessarily
> include all previous evaluations. Special emphasis will be given to the
> developmental issues raised in all previous evaluations, viewed as a whole.
> From this historical retrospective, a summary will be made describing the
> developmental trajectory the faculty member has followed to date, and a
> statement of future expectations for continued professional development
> will be crafted. While all faculty evaluations may include input from
> sources outside the College community, the ninth year evaluation must
> include documentation of the faculty member's professional work . . . from
> peers and others . . . who are outside the Goddard College community.
> Additionally, the ninth year evaluation should address faculty members'
> ongoing capacity to serve as senior leaders within their programs, the
> faculty membership, and the College[.]

*Id.*

Similar to the general evaluation procedure, in the comprehensive review process, the peer reviewers submit their comments to the Program Director, who drafts the final evaluation and recommends whether the faculty member should be reappointed or terminated. Prior to submission of the comprehensive review to the Chief Academic Officer, the Program Director is required to provide the faculty member with a copy of the final evaluation "for comment and feedback." (Doc. 40-27 at 5.) The Program Director then submits the final evaluation to the Chief Academic Officer, with a copy sent to the faculty member. In the event that the Program Director recommends that the faculty member not receive an appointment, the faculty member has the opportunity to appeal to the Chief Academic Officer within fourteen days of receiving a copy of the Program Director's recommendation. The Chief Academic Officer then decides whether to "require remediation specific to the basis of the appeal, or [] accept the recommendation of the committee and act accordingly." *Id.* at 6. If the recommendation is adopted by the Chief Academic Officer, "[a]n unsuccessful comprehensive review [is] sufficient to terminate the faculty member's employment[,] . . . regardless of the length of time that may remain on the existing appointment term." *Id.* at 5. The faculty member has the option of appealing the Chief Academic Officer's decision to the President if "the

5

faculty member believe[s] the appeal process itself deviated substantially from the [specified] process[.]" *Id.* at 6.

C. **Plaintiff's Employment, Evaluations, and Termination.**

Plaintiff is a San Francisco resident who was born in Japan. She has a MFA degree, and has worked as an instructor and lecturer at several universities and colleges. Plaintiff was employed as a faculty advisor in Defendant's MFAIA Program from 2003-2011, during which time she was a member of the GCFU.

In 2004, Plaintiff received her first performance evaluation as a MFAIA faculty advisor. At that time, Danielle Boutet was the MFAIA Program Director, and she authored Plaintiff's 2004 evaluation. In that evaluation, Ms. Boutet described Plaintiff as an "amazing resource for her advisees" who "will often go out of her way to help a student[.]" (Doc. 40-15 at 2.) She noted that Plaintiff "takes her students' work and their learning very seriously, and seems to enjoy her work with them." *Id.* She identified Japanese art and culture as Plaintiff's particular areas of interest.

In July 2006, Plaintiff was again evaluated by Ms. Boutet, with Jacqueline Hayes and another faculty member serving as her peer reviewers. Both peer reviewers were Caucasian. In that evaluation, Ms. Boutet explained that "[Plaintiff's] peer evaluators underlined her professionalism and her scholarly knowledge, and expressed appreciation for the diversity that [Plaintiff] brings to the faculty: not only by her Japanese ancestry but through her intellectual approach, her academic values, a different teaching style, and so forth." (Doc. 40-16 at 2-3.) Ms. Boutet noted, however, that the peer reviewers observed Plaintiff's "lack of passionate engagement" with students' work and Plaintiff's frequent expressions of disappointment with students. *Id.* at 3. Ms. Boutet concluded that:

> [t]here is no doubt that [Plaintiff] is a professional artist and a fine scholar. But she seems to have difficulty operating within an individualized and progressive education environment like the MFAIA, which puts its focus on the student's personal development[,] . . . as opposed to meeting a teacher's expectations. . . . After three years [of] working with Goddard students, [Plaintiff] does not seem to have found an advising style that articulates in practice [the College's] unique educational philosophy.

*Id.* As a result of these concerns, Ms. Boutet decided to develop a training and supervision plan for Plaintiff, and determined that Plaintiff would undergo another evaluation the following year.

Plaintiff disagreed with the conclusions reached in the July 2006 evaluation, and requested that the evaluation be withdrawn and conducted by "multicultural" peer reviewers. (Doc. 40-5 at 15.) Plaintiff submitted this request because "[t]he multicultural faculty knew [her] better, and [the] chances of getting a positive evaluation [were] greater, obviously," if the peer reviewers knew her. *Id.* Ms. Boutet agreed to conduct another evaluation and to assign Gale Jackson, an African-American faculty advisor, and Laiwan, a Chinese faculty advisor, as Plaintiff's peer reviewers.

In October 2006, Ms. Boutet submitted a revised evaluation of Plaintiff, incorporating feedback from her new peer reviewers.[6] Ms. Boutet summarized the peer reviewers' comments, observing that they valued Plaintiff's diversity in her Japanese "ancestr[al]" background and her intellectual approach, and that "[Ms.] Jackson thinks highly of [Plaintiff's] teaching[.]" (Doc. 40-18 at 2.) Although the evaluation contained many positive findings, it identified two concerns regarding Plaintiff's work:

> First, students are hesitant in requesting to work with [Plaintiff], which makes it sometimes difficult to make student assignments. Second, there is need for improvement in [Plaintiff's] responses to students from the [MFAIA] [P]rogram's perspective, that of an individual, progressive and holistic response to students. Some written feedback to students lacked the depth and the complexity of graduate level work, and there was not the feeling of a genuine involvement in an engaged, personal dialogue with the student.

*Id.* at 3. Ms. Boutet concluded that Plaintiff would continue receiving peer mentorship from Laiwan, and that she would undergo another evaluation at the end of the 2006-07 academic year.

In the fall of 2008, Plaintiff underwent another evaluation, which was submitted on January 24, 2009. By that time, Ms. Boutet had resigned as Program Director and Ju-

---

[6] It is unclear whether the July 2006 evaluation was formally withdrawn or replaced by the submission of the October 2006 evaluation.

7

Pong Lin and Ms. Hayes were Co-Directors of the MFAIA Program. Ms. Lin conducted Plaintiff's evaluation and assigned two Caucasian faculty advisors, Rick Benjamin and Cynthia Ross, to submit peer reviews. Plaintiff was satisfied with her peer reviewers because she liked them personally and trusted them. The fall 2008 evaluation found that "[Plaintiff] is quite effective as an advisor and much appreciated by her advisees." (Doc. 49-27 at 2.) The evaluation contained several examples from both colleagues and students, praising Plaintiff's ability to encourage and relate to students. Ms. Lin concluded that Plaintiff "ha[d] served the [MFAIA] [P]rogram very well" and that she was "delighted to recommend her for reappointment." *Id.* at 4.

In March 2009, Ms. Lin and Ms. Hayes became aware of three students' complaints concerning Plaintiff. All three students questioned whether Plaintiff had fully read their submissions, and raised other issues regarding the care and quality of Plaintiff's feedback. On December 14, 2009, Ms. Lin sent a letter to Plaintiff, wherein she detailed the students' concerns. Ms. Lin observed that Plaintiff lacked "depth and attentiveness" in responding to those students' packets, but Ms. Lin also made clear that "the few student concerns that have surfaced over the last year are exceptions to the overall quality of [Plaintiff's] advising[.]" (Doc. 40-21 at 3, 6.) Ms. Lin concluded that Plaintiff would "carry a regular advising load of [seven] advisees next semester[,]" rather than the increased advising load that she had been carrying, and that a Program Co-Director would review Plaintiff's packet responses before sending them to students. *Id.* at 6. Ms. Lin also stated that she was "not taking disciplinary action," and that "th[e] letter [would] not go into [Plaintiff's] file." *Id.* at 6-7.

Plaintiff subsequently filed a grievance.[7] In response, Defendant agreed that Plaintiff would not need to submit her packet responses for review. She, however, was expected to engage with the Co-Directors in professional development. Defendant also noted that "[f]or the semester about to ensue, [Plaintiff] will be assigned the contracted number of advisees unless enrollment or curricular needs indicate a need to request that

---

[7] Neither party has submitted a copy of Plaintiff's grievance; however, both parties have submitted copies of Defendant's response thereto.

she take on additional advisees[,]" which she would be free to accept or decline. (Doc. 49-59 at 4.)

In 2011, Ms. Hayes, who had become the sole Program Director for the MFAIA Program, initiated Plaintiff's comprehensive review process. In January 2011, she presented Plaintiff with four potential peer reviewers: Erica Eaton, Peter Hocking, Kira Obolensky, and Ruth Wallen. Plaintiff did not express any preference among the four proposed peer reviewers, but advised that she did not want to work with any of them. At the time, Plaintiff believed that Mr. Hocking held racist views, but she did not express this opinion to Ms. Hayes. She did not want Ms. Obolensky or Ms. Wallen to conduct her peer review because she had limited interaction with them in the past, but it is unclear whether she presented this concern to Ms. Hayes. Plaintiff requested that Ms. Ross and Ms. Jackson serve as her peer reviewers instead. Ms. Hayes responded that Plaintiff needed to pick among the four individuals identified. Plaintiff decided that she "would work with Hocking and Eaton" but she was "not happy with it." (Doc. 49-19 at 6.) Later that day, Plaintiff initialed a form acknowledging that Ms. Eaton and Mr. Hocking would conduct her peer review. Lisa Weil was subsequently appointed as vice chair of Plaintiff's comprehensive review committee.

In March 2011, with the Side Letter Agreement not yet signed, faculty members debated whether to postpone for one semester the comprehensive reviews of seven faculty members, including Plaintiff. After those discussions and the signing of the Side Letter Agreement, Academic Vice President Marianne Reiff concluded that the comprehensive reviews would move forward as scheduled to honor the agreement reached between Defendant and the GCFU. On May 6, 2011, Jennifer Tripp Mead, the Executive Assistant to the Academic Vice President, distributed a template for the comprehensive reviews that would occur that term. The template outlined the standard materials to be considered in the comprehensive review, as well as the criteria to be evaluated.

Plaintiff's comprehensive review committee was required to consider the self-assessment that Plaintiff submitted, which included a five-page narrative discussing

9

procedural errors in Plaintiff's prior evaluations and her conflicts with other faculty. Plaintiff avers that she believed Ms. Hayes expected her to address these issues. The peer reviewers, however, expressed confusion with Plaintiff's narrative because they did not have information regarding the context in which the issues arose. Plaintiff also submitted her packet responses for two students, which Plaintiff was entitled to select. On June 8, 2011, Plaintiff discussed her submissions with her peer reviewers on a conference call.

After the June 8, 2011 conference call, Ms. Eaton, Mr. Hocking, and Ms. Weil sent their evaluations of Plaintiff to Ms. Hayes. On June 17, 2011, Ms. Hayes requested that the peer reviewers revise their evaluations in order to correspond with the comprehensive review criteria. Also on June 17, 2011, Ms. Hayes asked Plaintiff to send the comprehensive review committee a third set of student packets and responses. Although the Program Director was entitled to choose the third student, Ms. Hayes permitted Plaintiff to make that selection.

In June 2011, Ms. Hayes received the peer reviewers' revised comments. In addition to considering the materials submitted during the comprehensive review process, Mr. Hocking's evaluation of Plaintiff was impacted by his observations of Plaintiff's advising of students. In his work with second-semester students, he observed that students who had worked with Plaintiff during their first semester were "often unprepared[,] . . . did not have an understanding of the degree criteria or the degree requirements, [and] . . . had not made progress in their graduate studies in a way that they proved capable of progressing in their second semester." (Doc. 40-9 at 7.) Ms. Eaton and Ms. Weil limited their evaluations of Plaintiff to the materials presented to them during the comprehensive review process.

In drafting the final comprehensive review, Ms. Hayes considered the peer reviewers' comments, the student evaluations, and other materials, including documents submitted by Plaintiff. Ms. Hayes observed that in the packet responses reviewed by the committee, "the level of dialogue [Plaintiff] is engaged in with the students is simplistic and not graduate level discourse." (Doc. 40-38 at 5.) Ms. Hayes cited to Plaintiff's October 2006 evaluation, wherein Ms. Boutet observed a similar concern: "'Some written

10

feedback to students lacked [the] depth and the complexity of graduate level work, and there was not the feeling of a genuine involvement in an engaged[,] personal dialogue with the student.'" *Id.* (quoting Doc. 40-18 at 3). Ms. Hayes concluded that she did "not observe any difference in the results of [Plaintiff's] advisement five years later—since the concern was expressed by her [Program Director] in 2006." *Id.* at 9. Ms. Hayes reported the peer reviewers' similar observation that Plaintiff's packet responses to first semester students "were short of specifics regarding the student's work." *Id.* at 5. Ms. Hayes concluded that "[w]hat is missing and what her peer reviewers note in all of the packet responses [Plaintiff] submitted is a deep engagement with the ideas present in the student's work." *Id.* at 8. Ms. Hayes incorporated Mr. Hocking's remark that "there is concern among [Plaintiff's] comprehensive review committee that she has limited capacity to engage with students who don't share her area of interest." *Id.* at 7.

The peer reviewers found that Plaintiff's pedagogical approach to first-semester students was "to get them to see that all of their practices—e.g. walking, taking photos, writing haiku—are part of the work." *Id.* at 5 (internal quotation marks omitted). Ms. Hayes observed that "[i]n her [ninth] year of service in the program, it is of great concern that [Plaintiff's] understanding of the advisor's role [for first-semester students] is not consistent with current norms and practices in the program and that her advisees are not being grounded in how to engage with the degree criteria in ways that are consistent with their peers." *Id.*

Ms. Hayes expressed concern regarding Plaintiff's limited technology skills, and her unwillingness to improve them. Several students reported that Plaintiff had told them that "the College was not providing her with the software necessary for her to accept on-line packets" as an excuse for not receiving packets via email. *Id.* at 7.

Ms. Hayes's concerns about Plaintiff's capabilities as a faculty advisor led to the recommendation that Plaintiff not receive a reappointment to the faculty. On June 30, 2011, Ms. Hayes sent a draft of the final comprehensive review to the committee members. In her email, she asked that "[i]f [any peer reviewer] would like to formulate a

11

dissenting view to pass on to the [Academic Vice President] together with this evaluation, please let [her] know right away." (Doc. 40-37 at 2.)

Mr. Hocking replied that "[h]aving read and digested [Ms. Hayes's] thorough report, [he] do[es] endorse [her] recommendation not to reappoint [Plaintiff]." (Doc. 40-40 at 2.) Ms. Eaton similarly did not object, but noted that Ms. Hayes had written "about issues that [Ms. Eaton] ha[d] 'heard' about repeatedly[,] but [] did not have any definitive evidence of a number of the issues." (Doc. 40-39 at 2.) Ms. Weil expressed "mild shock" regarding Ms. Hayes's recommendation. (Doc. 40-41 at 2.) She explained that she had not been privy to much of the information regarding Plaintiff's prior issues, which were discussed in Ms. Hayes's final comprehensive review. She further explained that had she been fully informed, it "would have resulted in a very different kind of conversation, first among [the peer reviewers] and then with [Plaintiff]." *Id.* She questioned "the viability of the peer review process in a case like this when there is serious doubt about an advisor's effectiveness[,]" and observed that "where members of the committee are not playing with a full deck, . . . there's a good chance that peer reviews . . . will be not only ineffective but misguided." *Id.* She nonetheless concluded that she was "totally willing to defer to [Ms. Hayes's] judgment." *Id.*

On July 3, 2011, with no indication that any peer reviewer intended to assert a dissenting opinion, Ms. Hayes sent the final comprehensive review to Plaintiff and Academic Vice President Reiff. Plaintiff did not have an opportunity to express her disagreement with the conclusions reached in the comprehensive review prior to its submission to Academic Vice President Reiff. On July 7, 2011, Academic Vice President Reiff sent a letter to Plaintiff, explaining that she would adopt Ms. Hayes's recommendation and terminate Plaintiff's employment. Plaintiff appealed this decision. Academic Vice President Reiff received Plaintiff's appeal, which did not "cause [her] to reconsider [her] determination or question [the] initial determination[,]" but instead "solidified [her] initial determination." (Doc. 40-14 at 12.) Plaintiff subsequently appealed to President Barbara Vacarr, who also affirmed the decision. President Vacarr

12

explained that she had "reviewed the documentation, both process and evaluation," in reaching her conclusion. (Doc. 40-44 at 2.)

After Plaintiff exhausted the appeals process, the GCFU filed a grievance on her behalf. In the grievance, Karen Rosenberg, International Representative for the union, asserted that Plaintiff's comprehensive review was "ridden with inaccuracies and misrepresentations and tainted by serious procedural problems, including reliance on documents which were not supposed to be in [Plaintiff's] record[.]" (Doc. 49-44 at 2.) "Most egregiously, [Plaintiff] was not given the opportunity to review and respond to a draft of the [comprehensive review] and thus, had no chance to explain or refute these things before a final decision was made." *Id.* She pointed out that the comprehensive review placed "an extremely unbalanced focus on a relatively few negative assessments to the almost total exclusion of the overwhelmingly positive reviews [Plaintiff] has received from prior program directors, peers and students." *Id.* Ms. Rosenberg noted that:

> all of these allegedly negative experiences relate to just three students, . . . each of whom had some early difficulties in their semesters but eventually expressed satisfaction with [Plaintiff's] advising. Incredibly, the [comprehensive review] fails to disclose that [the] concerns about [Plaintiff's] advising of these three students were reviewed . . . in the context of a grievance brought by [Plaintiff] . . . [and were] overturned . . . in [a] . . . decision [explaining]: "it is apparent that the complaints on which the aggrieved actions were based were, as [Plaintiff] noted, amicably resolved, and [Plaintiff] participated full[y] and thoughtfully in those resolutions."

*Id.* at 2-3 (emphasis omitted). The GCFU grievance did not result in an alteration of Plaintiff's dismissal.

Defendant did not hire a faculty advisor to fulfill Plaintiff's duties for the following semester; instead, students that Plaintiff would have advised were assigned to other faculty advisors. In January 2013, Michael Sakamoto, a Japanese-American, became Co-Director of the MFAIA Program, a position that he retained until his voluntary resignation in 2015.

13

## II.    The Disputed Facts.

### A.    Procedural Irregularities.

Plaintiff points to what she characterizes as "irregular procedures[,]" which she contends create a disputed issue of material fact as to whether Defendant altered its customary comprehensive review process to ensure that Plaintiff would not be reappointed. *See* Doc. 47 at 20.  Plaintiff challenges the timing of her comprehensive review as suspect because she asserts that it took place in a "rushed" manner. *See* Doc. 48 at 12, ¶ 111.  Plaintiff avers that three other non-Japanese faculty—Elena Georgiou, Jessica Morris, and Gale Jackson—had their comprehensive reviews delayed, even though they were otherwise on the same schedule as Plaintiff.  Defendant counters that the timing of Plaintiff's comprehensive review was consistent with the requirements of the Side Letter Agreement, and that the GCFU sought to have the terms of the Side Letter Agreement enforced. *See* Doc. 40-14 at 5 (Academic Vice President Reiff noting that she remembered "getting pressure from the union to do what we said we were going to do [in the Side Letter Agreement], so, not pressure but they weighed in").  Defendant further points out that of the three individuals identified by Plaintiff, only Ms. Georgiou had her comprehensive review delayed, as she was serving as an interim Program Director at the time.

Plaintiff disputes whether she approved of Ms. Hayes and Ms. Eaton performing her comprehensive review, and she cites a number of criticisms she finds with each of them.  In response, Defendant notes that, prior to Plaintiff's comprehensive review, she expressed favorable impressions of Ms. Hayes and Ms. Eaton.[8]

Plaintiff argues that during the comprehensive review, the committee improperly considered her July 2006 evaluation that had been replaced by the October 2006

---

[8] In 2008, as a peer reviewer for Ms. Hayes's evaluation, Plaintiff stated: "[Ms. Hayes] bring[s] a wealth of experience as a practicing artist and faculty member which enriches [the] Goddard community.  It is an honor and pleasure to work with [Ms. Hayes] in [the MFAIA] [P]rogram." (Doc. 40-19 at 3.)  In 2010, Plaintiff served as a peer reviewer for Ms. Eaton's performance evaluation.  Plaintiff wrote that Ms. Eaton's "call to model social justice [is] invaluable to us as [a] faculty[,]" and that Ms. Eaton "has high moral standards." (Doc. 40-24 at 4) (emphasis omitted).

14

evaluation, and the March 2009 letter from Ms. Lin to Plaintiff that stated it would not be included in Plaintiff's personnel file. Defendant asserts that no withdrawn materials were considered in Plaintiff's comprehensive review. Plaintiff also disputes whether students avoided her as a faculty advisor and, if so, whether this was relevant evidence in a comprehensive review. Defendant responds by citing evidence that students avoided Plaintiff as a faculty advisor.[9]

### B.    Evidence of Defendant's Alleged Bias.

The parties dispute whether Defendant's employees exhibited bias against persons of Japanese descent. Plaintiff testified in her deposition that, in July 2006, Susan Fleming, the Academic Dean at the time, and Ms. Boutet made identical comments in separate conversations, stating that "[Plaintiff] may not be able to do this job because of [her] culture" and that "[she] may be happier working somewhere else." (Doc. 40-5 at 11.) Ms. Fleming and Ms. Boutet both denied under oath making such statements. Defendant points out that neither Plaintiff's diary from the relevant time period nor her email to union representatives reference these alleged discriminatory remarks.

As further evidence of bias, Plaintiff points to Ms. Lin's deposition testimony that "[Plaintiff] is quite steeped in her Japanese culture. And a lot of my work is about my identity as a Taiwanese American and, you know, my interests in the history of Taiwan. So there were those kinds of differences." (Doc. 49-12 at 4.) Plaintiff contends that this is consistent with "many Taiwanese-Americans [who] have held animosity towards Japanese-Americans because of the hostilities of World War II." (Doc. 49-1 at 2, ¶ 2.)[10] Defendant notes that Ms. Lin also testified there were no "cultural differences that caused a division between [her and Plaintiff]" and that they "shared an interest in . . . the

---

[9] In the spring 2011 semester, for example, it is undisputed that no student chose Plaintiff as their preferred "second reader." Plaintiff claims that she was omitted from the list of options, whereas Defendant points out that the form allowed the students to type in their choices, rather than choose from a list. *See* Docs. 49-35 at 4, 40-38 at 12.

[10] In her deposition, Plaintiff called Ms. Lin "a banana" and explained that "[s]he's got yellow skin but she thinks like a white and she's a disassociated Taiwanese who doesn't know her own culture[.]" (Doc. 40-5 at 19.)

theoretical framework of cultural appropriation and understanding how . . . colonizing and dominant cultures appropriate from other cultures[.]" (Doc. 49-12 at 4.)

Plaintiff identifies comments and conduct by members of her comprehensive review committee as evidencing their bias against her.[11] Both Mr. Hocking and Ms. Hayes described Plaintiff as "quiet[,]" Docs. 49-53 at 6, 40-38 at 6, and Plaintiff avers that being "quiet" is a "general stereotype [about Japanese people] that flies around." (Doc. 40-5 at 32.) Plaintiff also argues that Ms. Hayes exhibited her bias against persons of Japanese descent by treating Japanese-African-Canadian faculty member Valerie Walker adversely, and by criticizing the presentation of Japanese-Canadian visiting artist Haruko Okano. Defendant responds that Ms. Walker was hired on a six-month contract to replace a faculty member who was on leave, that Ms. Walker had performance issues, and that although Ms. Hayes criticized Ms. Okano's presentation, her comments were unrelated to Ms. Okano's Japanese ancestry.

### C.    Whether Dr. Harvey's Opinion is Admissible.

In opposing summary judgment, Plaintiff relies on the expert opinion of Paul Harvey, Ph.D., and asserts that his expert opinion creates a disputed issue of fact as to whether her termination was the product of unlawful discrimination. Dr. Harvey opines that:

> [Defendant] subjected [Plaintiff] to an evaluation process that permitted evaluators with pre-existing cultural biases to develop a negative performance review that enabled [Defendant] to dismiss her. In other words, it is more likely than not that [Defendant's] dismissal of [Plaintiff] was based upon racial and/or national origin discriminatory attitudes among certain faculty at the college.

(Doc. 49-46 at 2.)

_____

[11] Plaintiff points to Ms. Eaton's statement that "[Plaintiff] notes that she appreciates the rigor that her family of origin taught her. She was raised to have a great deal of discipline and to be a very hard worker[,]" (Doc. 40-35 at 6), and Mr. Hocking's statement that "[Plaintiff] needs to consider whether the program provides the right environment for her teaching practice." (Doc. 49-53 at 6.) In her deposition, Plaintiff also testified that Mr. Hocking criticized her facilitation of a haiku practice with her students.

Defendant argues that Dr. Harvey's opinion is inadmissible because he is not qualified to serve as an expert witness in this case, and because he relied on "assumptions that are either demonstrably false or based on unsupported facts missing from the summary judgment record." (Doc. 51 at 7.) The court need not address whether Dr. Harvey is qualified as an expert witness because his opinions are inadmissible for other reasons.

Dr. Harvey is an Associate Professor in the Management Department at the University of New Hampshire, Paul College of Business and Economics. He has a doctorate degree in Organizational Behavior, which was awarded in 2006. In formulating his opinion in this case, Dr. Harvey relied on "the litigation file, particularly a [written] narrative that [Plaintiff] prepared, the revised evaluation procedure/policy[,] and [Ms.] Hayes'[s] evaluation of [Plaintiff][,]" in addition to his experience as a researcher of organizational behavior. (Doc. 49-46 at 5.)

 Fed. R. Evid. 702 governs the admissibility of expert opinions, and provides that:

 A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

- (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
- (b) the testimony is based on sufficient facts or data;
- (c) the testimony is the product of reliable principles and methods; and
- (d) the expert has reliably applied the principles and methods to the facts of the case.

The Supreme Court has observed that the trial court performs a "gatekeeping role" to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 590, 597 (1993); *see Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (extending *Daubert*'s standards for admissibility of scientific expert testimony to "all expert testimony"). "[I]t is appropriate for the district court to determine the admissibility of [expert witness] evidence and to rely only on admissible evidence in ruling on summary judgment."

*Riegel v. Medtronic, Inc.*, 451 F.3d 104, 127 (2d Cir. 2006).[12]  Even if admitted, "an expert's report is not a talisman against summary judgment." *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997).

"[A]lthough an expert may opine on an issue of fact within the jury's province, he may not give testimony stating ultimate legal conclusions based on those facts." *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991).  In opining that Defendant's dismissal of Plaintiff was based on "racial and/or national origin discriminatory attitudes among certain faculty[,]" (Doc. 49-46 at 2), Dr. Harvey arguably offers a legal conclusion as to whether discrimination occurred and whether it gave rise to an adverse employment action.  These opinions are inadmissible because they usurp the function of the judge and direct the jury to a particular conclusion.  *See Densberger v. United Techs. Corp.*, 297 F.3d 66, 74 (2d Cir. 2002) ("It is a well-established rule in this Circuit that experts are not permitted to present testimony in the form of legal conclusions.") (internal quotation marks omitted); *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) (holding that "[w]hen an expert undertakes to tell the jury what result to reach, this does not *aid* the jury in making a decision," but rather constitutes an inadmissible legal conclusion); *Rieger v. Orlor, Inc.*, 427 F. Supp. 2d 99, 104 (D. Conn. 2006) ("[W]hile [the expert] would be qualified to offer expert testimony that would assist the jury in understanding the types of measures that can be taken by employers to prevent discrimination and harassment[,] . . . the opinion he offers provides no specialized knowledge, but merely a legal conclusion."); *Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207, 1213 (D.D.C. 1997) ("Each courtroom comes equipped

---

[12] Although the court may hold an evidentiary hearing (a "*Daubert* hearing") to determine the admissibility of an expert opinion, in this case neither party has requested a hearing, nor would a hearing aid the court in determining the admissibility of Dr. Harvey's opinion for purposes of summary judgment. *See Kumho Tire*, 526 U.S. at 152 (noting district courts' broad discretion in deciding "whether or when special briefing or other proceedings are needed to investigate" an expert's reliability); *Berk v. St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 351 (S.D.N.Y. 2005) (holding that a *Daubert* hearing was unnecessary where "no party has sought a *Daubert* hearing or contended that it would facilitate the [c]ourt's resolution of Defendants' challenge to [the] expert testimony").

with a 'legal expert,' called a judge, and it is his or her province alone to instruct the jury on the relevant legal standards.").

In addition to offering a legal opinion, Dr. Harvey offers an opinion regarding Defendant's evaluation process that a jury is capable of reaching or rejecting without assistance. *See Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 160 (2d Cir. 2012) (in an employment discrimination case, affirming a district court's decision to exclude the expert testimony of an industrial psychologist "who would have testified that the [defendant's] promotion procedure was so unstructured and subjective that it fell below professional standards, and who would have compared the qualifications of the plaintiffs with those of the officers who were actually promoted" because it was not helpful to the jury). Dr. Harvey's opinion thus serves only to lend the imprimatur of an expert's qualifications to a matter within the jury's comprehension. *See United States v. One Parcel of Prop. Located at 31-33 York St., Hartford, Conn.*, 930 F.2d 139, 141 (2d Cir. 1991) (excluding expert testimony that would only complicate, not assist, the jury's decision on "a simple question for which the jury needed no help").

Dr. Harvey's opinion must be excluded for the additional reason that he relied on information that is unsupported by the record.[13] Although an expert opinion need not be based on admissible evidence, it must be based on "sufficient facts or data" and "reliable principles and methods[.]" Fed. R. Evid. 702; *see Daubert*, 509 U.S. at 590 (holding that expert opinions reflecting "subjective belief or unsupported speculation" must be excluded); *see also Berk v. St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 353 (S.D.N.Y. 2005) (concluding that an expert report by a medical doctor was inadmissible because it was "premised on the hybrid view of the facts put forward by [the plaintiff] for

---

[13] With regard to Plaintiff's written narrative, which was unsworn, Dr. Harvey "assume[d] that she was speaking the truth to the best of her ability." (Doc. 51-3 at 4.) The written narrative includes Plaintiff's allegation that Defendant exhibited favorable treatment toward a non-Japanese faculty member who plagiarized and that Defendant has experienced an "attrition of Japanese-American faculty members that is greater than that of any other denomination[.]" *Id.* at 7. Plaintiff has not supported these statements with admissible evidence. *See Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008) ("An expert's opinions that are without factual basis and are based on speculation or conjecture are similarly inappropriate material for consideration on a motion for summary judgment.").

purposes of summary judgment, as well as an additional symptom . . . that [was] based on neither party's evidence"). To the extent Dr. Harvey's opinion is based on Plaintiff's uncorroborated narrative in reaching conclusions about institutional bias, it "poses the risk of confusing and misleading the jury as it lends . . . a stamp of credibility to what . . . otherwise [may be] rank speculation." *See Rotman v. Progressive Ins. Co.*, 955 F. Supp. 2d 272, 283 (D. Vt. 2013). Because Dr. Harvey's expert witness opinion is inadmissible, it does not create a disputed issue of material fact for summary judgment.

## III.   Conclusions of Law and Analysis.

### A.   Standard of Review.

Summary judgment must be granted when the record shows there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The mere existence of disputed factual issues "will not suffice to defeat a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (internal quotation marks omitted). The disputed issues of fact must be "material to the outcome of the litigation[,]" *id.* at 11, and must be supported by evidence that would permit "a rational trier of fact to find for the non-moving party[.]" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) ("A fact is 'material' . . . when it 'might affect the outcome of the suit under the governing law[,]'" and "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'") (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004) (internal quotation marks omitted).

The moving party always "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material

fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). When the moving party has carried its burden, its opponent must produce "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249.

"The trial court's function in deciding such a motion is not to weigh the evidence or resolve issues of fact, but to decide instead whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000); *see also McClellan v. Smith*, 439 F.3d 137, 148 (2d Cir. 2006) ("'Resolutions of credibility conflicts and choices between conflicting versions of the facts are matters for the jury, not for the court on summary judgment.'") (quoting *United States v. Rem*, 38 F.3d 634, 644 (2d Cir. 1994)).

### B. Whether Defendant is Entitled to Summary Judgment With Regard to Plaintiff's Unlawful Retaliation Claim.

In her Amended Complaint, Plaintiff alleges that "[a]s a Japanese-American, [she] was engaged in a protected activity." Doc. 10 at 7, ¶ 49. Defendant seeks summary judgment on this claim because Plaintiff proffers no evidence that she was engaged in any protected activity.[14] In opposing summary judgment, Plaintiff does not address her unlawful retaliation claim and thus has abandoned it. *See Jackson v. Fed. Express*, 766 F.3d 189, 195 (2d Cir. 2014) (holding that "a partial response arguing that summary judgment should be denied as to some claims while not mentioning others may be deemed an abandonment of the unmentioned claims"); *Ostroski v. Town of Southold*, 443 F. Supp. 2d 325, 340 (E.D.N.Y. 2006) ("Because plaintiff's opposition papers did not address defendants' motion for summary judgment on this claim, the claim is deemed abandoned and summary judgment could be granted on that basis alone.").

---

[14] To establish a *prima facie* case of unlawful retaliation, "the plaintiff must show that (1) she engaged in a protected activity; (2) her employer was aware of that activity; (3) she suffered adverse employment decisions; and (4) there was a causal connection between the protected activity and the adverse employment action." *Robertson v. Mylan Labs., Inc.*, 2004 VT 15, ¶ 42, 176 Vt. 356, 376, 848 A.2d 310, 327-28.

Even in the absence of abandonment, Defendant has established its entitlement to summary judgment on Plaintiff's retaliation claim because there is no evidence that Plaintiff was engaged in protected activity or that Defendant was aware of that activity. Plaintiff therefore cannot establish the essential elements of a retaliation claim. *See Celotex*, 477 U.S. at 323 (holding that "[t]he moving party is entitled to a judgment as a matter of law [where] the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof") (internal quotation marks omitted). The court therefore GRANTS Defendant's motion for summary judgment with regard to Plaintiff's retaliation claim.

### C.   Whether Defendant is Entitled to Summary Judgment With Regard to Plaintiff's Employment Discrimination Claim.

Plaintiff alleges that in conducting her comprehensive review and terminating her employment, Defendant subjected her to unlawful discrimination on the basis of her national origin. Defendant seeks summary judgment on the grounds that Plaintiff cannot establish she was qualified for a five-year appointment, it had a legitimate basis for terminating Plaintiff's employment, and there is no credible evidence of discriminatory intent. Plaintiff responds that summary judgment cannot be granted in Defendant's favor because there are disputed issues of material fact and because Defendant's asserted reasons for her termination are pretextual.

The Second Circuit has "emphasized that trial courts must be especially chary in handing out summary judgment in discrimination cases, because in such cases the employer's intent is ordinarily at issue." *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 87 (2d Cir. 1996). "Since it is rare indeed to find in an employer's records proof that a personnel decision was made for a discriminatory reason, whatever other relevant depositions, affidavits and materials are before the district court must be carefully scrutinized for circumstantial evidence that could support an inference of discrimination." *Id.* Nonetheless, "[i]t is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases" because "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no

22

less to discrimination cases than to . . . other areas of litigation." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) (internal quotation marks omitted); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000) ("[T]rial courts should not treat discrimination [cases] differently from other ultimate questions of fact.") (internal quotation marks omitted).

In the context of a decision by an educational institution to grant or deny long-term employment to a faculty member, the court must avoid second-guessing or imposing its own view of the faculty member's qualifications. "Determinations about such matters as teaching ability, research scholarship, and professional stature are subjective, and unless they can be shown to have been used as the mechanism to obscure discrimination, they must be left for evaluation by the professionals[.]" *See Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 455 n.7 (2d Cir. 1999), *cert. denied*, 530 U.S. 1242 (2000) (internal quotation marks omitted). Indeed, "[a] university's prerogative to determine for itself on academic grounds who may teach is an important part of our long tradition of academic freedom." *Lieberman v. Gant*, 630 F.2d 60, 67 (2d Cir. 1980) (internal quotation marks omitted). The role of the court is therefore "narrowly limited to determining whether an illegitimate discriminatory reason played a motivating role in the employment decision." *Bickerstaff*, 196 F.3d at 456. "It is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking a basis in wisdom or compassion." *Wood v. Strickland*, 420 U.S. 308, 326 (1975).

In this case, Plaintiff concedes that she proffers no direct evidence of discrimination. Because her evidence is circumstantial, the Title VII framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) applies.[15] Pursuant to this framework, "[a]t the outset, the plaintiff has the burden of establishing a *prima facie* case of employment discrimination." *Robertson v. Mylan Labs., Inc.*, 2004 VT 15, ¶ 24, 176 Vt. 356, 366, 848 A.2d 310, 320. "Once the plaintiff has established a

---

[15] Vermont law mandates this approach. *See Boulton v. CLD Consulting Eng'rs, Inc.*, 2003 VT 72, ¶ 15, 175 Vt. 413, 421, 834 A.2d 37, 44 ("In the absence of direct evidence of unlawful discrimination, which plaintiff has not adduced, this [c]ourt applies the three-step burden-shifting analysis articulated in *McDonnell Douglas* . . . to [V]FEPA claims.") (citation omitted).

*prima facie* case, a presumption of discrimination arises, and the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.* at ¶ 26 (citation and internal quotation marks omitted). "If the employer meets [its] burden[,] . . . the presumption of discrimination disappears, and the burden then shifts back to the plaintiff to prove that the employer's justification is a mere pretext for discrimination." *Id.* at ¶ 27 (citation omitted). Despite these shifting burdens, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves*, 530 U.S. at 143 (internal quotation marks omitted).

**1.    Whether Plaintiff Can Establish a *Prima Facie* Case.**

To establish a *prima facie* case, Plaintiff must demonstrate that: "(1) she was a member of a protected group; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) the circumstances surrounding this adverse employment action permit an inference of discrimination." *Robertson*, 2004 VT 15, ¶ 25. "The evidentiary burden required of the plaintiff at this stage is a relatively light one." *Id.* at ¶ 24.

**a.    Elements One and Three: Membership in a Protected Group and Adverse Employment Action.**

Plaintiff easily satisfies the first and third elements of her *prima facie* case. She was a member of a protected group on the basis of her Japanese national origin, and she suffered an adverse employment action by virtue of Defendant's decision not to grant her a five-year appointment which, in turn, terminated her employment. *See Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 128 (2d Cir. 2004) ("Employment actions that have been deemed sufficiently disadvantageous to constitute an adverse employment action include a termination of employment[.]") (internal quotation marks omitted).

**b.    Elements Two and Four: Qualification and Inference of Discrimination.**

The parties dispute whether Plaintiff can establish that she was qualified for the position at issue. Plaintiff argues that she need only show that she possessed the basic

24

skills necessary to satisfy her responsibilities as a faculty advisor. Defendant disagrees this is the applicable standard and contends that Plaintiff must establish those basic skills and must further establish that she was qualified for a five-year appointment based on the standards of the comprehensive review process. Defendant's position is supported by the record.

Pursuant to Defendant's collective bargaining agreement, as supplemented by the Side Letter Agreement, the comprehensive review is an "evaluation of a higher standard" that "include[s] all of the standard elements of faculty evaluations[,] . . . but the breadth of the review will necessarily include all previous evaluations. Special emphasis will be given to the developmental issues raised in all previous evaluations, viewed as a whole." (Doc. 40-20 at 15.) Accordingly, in the comprehensive review process, faculty members must not only demonstrate that they can fulfill the basic requirements of their existing positions, they must demonstrate that their trajectory reveals a progressive path of accomplishment and prepares them for a leadership role at Goddard College and elsewhere. The collective bargaining agreement describes this heightened expectation as follows:

> From [a] historical retrospective, a summary will be made describing the developmental trajectory the faculty member has followed to date, and a statement of future expectations for continued professional development will be crafted. . . . Additionally, the ninth year evaluation should address faculty members' ongoing capacity to serve as senior leaders within their programs, the faculty membership, and the College[.]

*Id.* The Side Letter Agreement contains an "up or out" policy whereby "[a]n unsuccessful comprehensive review [is] sufficient to terminate the faculty member's employment . . . regardless of the length of time that may remain on the existing appointment term." (Doc. 40-27 at 5.) Defendant was therefore entitled to terminate Plaintiff's employment if it deemed her comprehensive review "unsuccessful."

It is essentially undisputed that Plaintiff "possess[ed] the basic skills necessary for performance of" the faculty advisor position. *de la Cruz v. New York City Human Res. Admin. Dep't of Soc. Servs.*, 82 F.3d 16, 20 (2d Cir. 1996) (internal quotation marks

25

omitted).  In satisfying this requirement, Plaintiff "need not demonstrate that [her] performance was flawless or superior." *Id.*  However, a candidate for tenure "does not make out the elements needed for a *prima facie* case merely by showing qualifications for continuation as an untenured faculty member; indeed to hold that [s]he did would be in effect to negate the requirements beyond minimally satisfactory performance properly entering into the tenure decision." *Lieberman*, 630 F.2d at 64.  A candidate for tenure must show "much more than the showing of performance of sufficient quality to merit continued employment[.]" *Id.* (internal quotation marks omitted.)

In the light most favorable to Plaintiff, although a five-year appointment reflects a significant commitment by a college or university to a faculty member, it is substantially less than the "advancement to tenure[, which] entails what is close to a life-long commitment by a university[.]" *See id.*  Unlike a plaintiff who was denied tenure, Plaintiff is therefore not required to establish "*much more* than the showing of performance of sufficient quality to merit continued employment[.]" *See id.* (emphasis supplied and internal quotation marks omitted).  She must, however, demonstrate that she was qualified for a five-year appointment based on Defendant's standard for that employment.  In this case, the evidence regarding Plaintiff's satisfaction of that standard is decidedly mixed.

Plaintiff's first evaluation in 2004, authored by MFAIA Program Director Boutet, was uniformly positive.  In 2006, however, Plaintiff's initial peer reviewers noted her "lack of passionate engagement" with her students' work, prompting Ms. Boutet to conclude that Plaintiff "seems to have difficulty operating within an individualized and progressive education environment like the [MFAIA], which puts its focus on the student's personal development[,] . . . as opposed to meeting a teacher's expectations." (Doc. 40-16 at 3.)  Ms. Boutet further observed that "[a]fter three years [of] working with Goddard students, [Plaintiff] does not seem to have found an advising style that articulates in practice [Goddard's] unique educational philosophy." *Id.*  Plaintiff disagreed with those conclusions, asked that the evaluation be withdrawn, and requested a new evaluation conducted by "multicultural" peer reviewers.  There is no evidence that

26

Plaintiff was entitled to those outcomes.  Defendant nonetheless conducted a new evaluation with an African-American faculty member and a Chinese faculty member serving as Plaintiff's peer reviewers.  These individuals similarly concluded that "there is need for improvement in [Plaintiff's] responses to students from the [MFAIA] [P]rogram's perspective," and that some of Plaintiff's "written feedback to students lacked the depth and the complexity of graduate level work, and there was not the feeling of a genuine involvement in an engaged, personal dialogue with the student." (Doc. 40-18 at 3.)  Thereafter, Plaintiff received peer mentorship by a multicultural faculty member with the expectation that Plaintiff would be re-evaluated at the conclusion of the 2006-07 academic year.

In the fall 2008 evaluation, Plaintiff was evaluated by Ms. Lin and two Caucasian faculty members who concluded that she was "quite effective as an advisor and much appreciated by her advisees" and that she "has served the [MFAIA] [P]rogram very well[.]" (Doc. 49-27 at 2, 4.)  Ms. Lin noted that she was "delighted to recommend her for reappointment." *Id.* at 4.  By March of 2009, however, three students had complained about Plaintiff's performance as their advisor, questioning whether she had fully read their submissions and raising concerns about the care and quality of Plaintiff's feedback. Through Ms. Lin, Defendant responded by notifying Plaintiff of the students' concerns, agreeing that Plaintiff lacked "depth and attentiveness" in responding to these students, and concluding that these student complaints were exceptions to the "overall quality of [Plaintiff's] advising[.]" (Doc. 40-21 at 3, 6.)  Defendant proposed certain corrective measures, which Plaintiff successfully grieved and which were therefore not imposed. Plaintiff was, however, expected to engage in professional development with Co-Directors Lin and Hayes.

Plaintiff's next evaluation was the 2011 comprehensive review that led to her termination.  Although positive aspects of Plaintiff's performance were noted, the comprehensive review yielded some of the same criticisms that had been lodged previously, namely that Plaintiff lacked engagement with her students' work, that her responses to that work did not reflect the depth and complexity commensurate with

27

graduate level work, and that she had made insufficient progress since these concerns first surfaced. Without objection from the peer reviewers, Ms. Hayes, as the MFAIA Program Director, recommended that Defendant decline to grant Plaintiff a five-year appointment.

Against this backdrop, even when the evidence is viewed in the light most favorable to Plaintiff, it is questionable whether a rational jury could conclude that Plaintiff was qualified for a five-year appointment that required a "developmental trajectory" reflecting Plaintiff's capacity to be a "senior leader" in her program, the faculty, and the college. (Doc. 40-20 at 15); *see Brenner v. City of New York Dep't of Educ.*, 2015 WL 5475628, at \*7 (E.D.N.Y. Sept. 17, 2015) ("'[W]here a plaintiff can provide no circumstantial evidence . . . that negative evaluations of his job performance were unfair or improperly issued, and all objective indications show fair evaluation procedures, there is no material issue of genuine fact to be tried, and plaintiff's claim cannot survive summary judgment.'") (quoting *Lawrence v. State Univ. of N.Y.*, 2002 WL 31812700, at \*5 (S.D.N.Y. Dec. 12, 2002)). Assuming Plaintiff could overcome this hurdle, whether the circumstances permit an inference of discrimination presents an even closer question.

Plaintiff asserts that because the majority of her previous evaluations were positive, dismissal based on her comprehensive review must be the product of bias. The undisputed facts, however, reveal that while some of Plaintiff's previous evaluations were positive, others were not. *Compare Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 717-18 (2d Cir. 1994) (the plaintiff alleging that the review leading to his termination was "suspect because it was the first adverse review he had received," and the Second Circuit observing that "[d]ismissals are often preceded by adverse performance reviews[;] [w]ere we to view this pattern as suspect, without more, many employees would be able to appeal their personnel evaluations to a jury"), *with Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 383 (2d Cir. 2001) (holding that a rational juror could infer the defendant's discriminatory intent where the plaintiff "provided ample evidence of good performance and the complete absence of any

28

negative evaluations"); *see also Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 137 (2d Cir. 2000) (noting that "during his employment with [the defendant], [the plaintiff] never received a negative written performance evaluation or formal warning, nor is there any writing whatsoever criticizing his job performance, indicating that as a reason for his firing poor job performance was an afterthought"). Plaintiff received her first negative evaluation approximately five years prior to her termination, and there is no evidence that Defendant manufactured a paper trail to justify her termination. *Cf. Dupree v. UHAB-Sterling St. Hous. Dev. Fund Corp.*, 2012 WL 3288234, at *9 (E.D.N.Y. Aug. 10, 2012) (noting that a manufactured paper trail to justify an adverse employment action may be evidence of discrimination because "[a] jury could reasonably conclude that it was only when the [d]efendants set out to justify their decision to terminate [the plaintiff] that they began to document problems with his performance").

　　Although Plaintiff suggests that any prior criticism of her performance was also the product of bias, two of the individuals who expressed these criticisms—Ms. Boutet and Ms. Lin—are the same individuals upon whom Plaintiff relies in claiming her prior evaluations were satisfactory. The "same actor" principle dispels any rational inference of bias. *See Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997) (noting that "[w]hen the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire"); *see also Cordell v. Verizon Commc'ns, Inc.*, 331 F. App'x 56, 58 (2d Cir. 2009) (observing that the "same actor" principle "remains a highly relevant factor in adjudicating a motion for summary judgment") (internal quotation marks omitted).

　　In the absence of bias, whether Plaintiff disputes the accuracy of Defendant's criticism of her performance is irrelevant. *See McPherson v. New York City Dep't of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006) (providing that the "*reliability*" of negative performance evaluations is not relevant because "[i]n a discrimination case . . . we are decidedly not interested in the truth of the allegations against plaintiff. We are interested in what '*motivated* the employer[.]'") (quoting *U.S. Postal Serv. Bd. of Governors v.*

*Aikens*, 460 U.S. 711, 716 (1983)); *Brenner*, 2015 WL 5475628, at *7 (explaining that "[m]ere 'disagreement with [an] employer's evaluation of [an employee's] performance is insufficient to establish discriminatory intent' because 'disagreements . . . do not, as a matter of law or logic, mean that present poor performance reviews [are] unfounded[]'") (quoting *Mattera v. JPMorgan Chase Corp.*, 740 F. Supp. 2d 561, 574-76 (S.D.N.Y. 2010)). "Indeed, there is no requirement that an employer's negative assessments have been objectively correct, only that the assessments have been made in good faith." *Id.* In this case, Plaintiff proffers no evidence that her prior negative performance evaluations were unfair, the product of bad faith, or the result of "bizarre or duplicitous processes[.]" *See McPherson*, 457 F.3d at 216 n.7.

Plaintiff's claim that her comprehensive review was riddled with procedural irregularities and her assertion that this constitutes evidence of bias fares no better. She points out that she was not afforded the opportunity to comment on her comprehensive review before its submission to Academic Vice President Reiff for adoption. She does not, however, further claim that her ability to comment on her comprehensive review would have changed its outcome. In the comprehensive review process, Plaintiff was provided the opportunity to submit a self-assessment, which she used to discuss procedural errors with her prior evaluations and conflicts with certain faculty members. She points to no evidence that a discriminatory animus caused or contributed to her inability to comment further. *See Tori v. Marist Coll.*, 344 F. App'x 697, 701 (2d Cir. 2009) (holding that where a plaintiff relies on procedural irregularities as evidence of discrimination, "summary judgment is appropriate where there is no evidence that discrimination played a role in any alleged procedural irregularities"). She was also permitted to file an appeal that served the same purpose and thus cured any harm from the prior procedural defect. *See Weinstock v. Columbia Univ.*, 224 F.3d 33, 45 (2d Cir. 2000) (observing that "whatever irregularities existed did not affect the final decision to deny [the plaintiff] tenure[,]" and holding that "[t]herefore, any possible procedural irregularities in the denial of [the plaintiff's] tenure were not enough to suggest gender bias").

The remaining procedural irregularities identified by Plaintiff do not support an inference of discrimination because Plaintiff does not demonstrate that she was entitled to her preferred procedures in the first instance. For example, Plaintiff does not demonstrate that she was entitled to have an evaluation withdrawn and student complaints disregarded; to dictate the identity of her peer reviewers or the members of her comprehensive review committee; or to insist that her evaluators be "multicultural" and have a favorable impression of her work. *See Ralkin v. New York City Transit Auth.*, 62 F. Supp. 2d 989, 998 (E.D.N.Y. 1999) (noting that "many of plaintiff's factual disputations appear to be rationalizations for her allegedly unsatisfactory performance rather than demonstrations of any genuine issue of material fact to be tried"). Plaintiff also does not establish that the timing of her comprehensive review was inconsistent with Defendant's collective bargaining agreement; that similarly situated faculty members had their comprehensive reviews delayed and benefitted from that delay; or that the timing of her comprehensive review produced the criticisms contained therein. As a result, even when viewed in the light most favorable to Plaintiff, the identified procedural irregularities do not create an inference of discrimination. *See Beshty v. Gen. Motors*, 327 F. Supp. 2d 208, 215 (W.D.N.Y. 2004) (explaining that evidence regarding "minor alleged deviations from [the defendant's] policies and procedures concerning the timing of performance reviews and the like" does not give rise to the inference of discrimination because the "alleged procedural irregularities are so minimal"); *Hajjar-Nejad v. George Washington Univ.*, 37 F. Supp. 3d 90, 142 (D.D.C. 2014) (holding that the plaintiff's discrimination claim fails as a matter of law, and noting that "the [c]ourt's review has revealed no procedural irregularities or at least not any material procedural irregularities suggesting pretext and reflecting discriminatory animus").

Plaintiff's reliance on comments and conduct among Defendant's employees is similarly unavailing.[16] In her deposition, Plaintiff testified that Ms. Boutet and Ms.

---

[16] Insofar as Plaintiff relies on Ms. Lin's Taiwanese ancestry and her perception that individuals of this ancestry are biased against people of Japanese ancestry, Ms. Lin was not involved in Plaintiff's comprehensive review and Ms. Lin generated arguably the most positive evaluation

31

Fleming commented: "[Plaintiff] may not be able to do this job because of [her] culture" and "[she] may be happier working somewhere else." (Doc. 40-5 at 11.) Even if these comments are deemed to have been made for purposes of summary judgment, neither Ms. Boutet nor Ms. Fleming "played a meaningful role" in Plaintiff's comprehensive review process. *See Bickerstaff*, 196 F.3d at 450 ("We recognize that the impermissible bias of a single individual at any stage of the promoting process may taint the ultimate employment decision . . . so long as the individual shown to have the impermissible bias played a meaningful role in the promotion process."). In addition, Plaintiff relies on a performance evaluation by Ms. Boutet as evidence of her satisfactory performance, which undercuts Plaintiff's allegation that Ms. Boutet was biased. In the evaluation, Ms. Boutet makes it clear that she views Plaintiff's Japanese ancestry and origin as an asset. *See Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 399 (7th Cir. 1997) (noting that a "presumption, or inference, of nondiscrimination arises" when the person alleged to have discriminated has granted the plaintiff favorable treatment in the recent past). In any event, the alleged remarks were remote in time, isolated, and were not made in the context of Plaintiff's termination. *See Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 545 (3d Cir. 1992) ("Stray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision."); *Brenner*, 2015 WL 5475628, at *8 (explaining that "remarks about a protected class do not themselves give rise to an inference of discrimination under Title VII unless they are accompanied by other evidence of discrimination or a plaintiff demonstrates a 'nexus' between the remark and the adverse employment action"); *White v. Andy Frain Servs., Inc.*, 629 F. App'x 131, 134 (2d Cir. 2015) ("White alleges that his supervisor made several off-color comments over the course of a year and a half about him being black and Jewish. But a rational factfinder could not reasonably find a causal connection between these remarks and any employment action of which he complains. Without

---

Plaintiff received. The "same actor" inference thus applies and dispels any inference of discriminatory intent.

some causal connection, these off-color comments were no more than stray remarks. And stray remarks, without other indicia of discrimination, are not enough.") (internal quotation marks omitted).

The comprehensive review committee members' comments that Plaintiff is "quiet" similarly do not permit an inference of discrimination. The word "quiet" is too general to evince discrimination on the basis of ancestry or national origin. *See Weinstock*, 224 F.3d at 44-45 ("It is simply not objectively reasonable to label these innocuous words[, 'nice' and 'nurturing,'] as semaphores for discrimination."). The committee members did not use the word "quiet" to make a negative judgment about Plaintiff, nor did they rely upon her allegedly "quiet" nature as a reason for denying Plaintiff a favorable recommendation. *See id.* at 44. The term therefore fails to demonstrate discriminatory intent. *See Brenner*, 2015 WL 5475628, at *8 ("Where a remark is 'ambiguous' as to whether it 'reflects discriminatory animus' it is not sufficient to support an inference of discrimination.") (quoting *Mayling Tu v. OppenheimerFunds, Inc.*, 2012 WL 516837, at *7 (S.D.N.Y. Feb. 16, 2012)); *see also Hyek v. Field Support Servs., Inc.*, 702 F. Supp. 2d 84, 91 (E.D.N.Y. 2010) ("'The summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion.'") (quoting *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)).

Finally, the evidence does not permit any inference that a pattern of disparate treatment persisted in Defendant's employment decisions. Plaintiff compares herself only to individuals with whom she is not similarly situated. *See Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 258 (1981) ("*McDonnell Douglas* teaches that it is the plaintiff's task to demonstrate that similarly situated employees were not treated equally."). Ms. Georgiou, whose comprehensive review was delayed, was serving as an interim Program Director and her comprehensive review was delayed on that basis. Ms. Walker was employed on a temporary, six-month basis while another faculty member was on leave. Ms. Okano was not a faculty member, but rather a visiting artist. *See Pollis v. New Sch. for Soc. Research*, 132 F.3d 115, 122 (2d Cir. 1997) ("In addition to

33

the small size of the group to which [the plaintiff] seeks comparison, each of the male
members of the group differs so substantially from [the plaintiff] that no meaningful
inference may be drawn from the statistics."). Moreover, as Defendant points out, less
than two years after Plaintiff's termination, it promoted Mr. Sakamoto, a Japanese-
American, to Co-Director of the MFAIA Program. *See Martin v. Alumax of S.C.*, 380 F.
Supp. 2d 723, 732 (D.S.C. 2005) ("[i]t is difficult to infer discrimination when the
evidence shows persons within the protected class are regularly promoted") (internal
quotation marks omitted); *Tori*, 344 F. App'x at 701 (concluding a college was not
motivated by impermissible discrimination when it declined tenure to a single, white,
Christian male because "of forty white male candidates who were considered by [the
college] for tenure or promotion between 1998 and 2006, 95% received tenure").

      Even when the evidence is regarded in the light most favorable to Plaintiff and
considered collectively as opposed to piecemeal, Plaintiff does not satisfy her *prima facie*
burden to establish an inference of discrimination. Defendant is therefore entitled to
summary judgment on Plaintiff's discrimination claim. *See Celotex*, 477 U.S. at 323.

      Assuming Plaintiff could establish a *prima facie* case, Defendant proffers a
legitimate, non-discriminatory reason for its termination decision. "Job performance and
relative employee qualifications are widely recognized as valid, non-discriminatory bases
for any adverse employment decision." *Evans v. Techs. Applications & Serv. Co.*, 80
F.3d 954, 960 (4th Cir. 1996); *see also Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579,
588 (6th Cir. 2002) ("Terminating an employee because he fails to perform satisfactorily
is a legitimate and nondiscriminatory reason to end his employment."); *Harrow v. St.
Luke's Cornwall Hosp.*, 485 F. App'x 488, 490 (2d Cir. 2012) ("A reasonable jury could
only find that the [defendant] fired [the plaintiff] for a legitimate, nondiscriminatory
reason: her long history of poor performance."). Ample uncontroverted evidence
demonstrates that Defendant properly relied on Plaintiff's mixed performance as a faculty
advisor in conducting her comprehensive review. The comprehensive review process, in
turn, was a bargained-for procedure that results in all-or-nothing appointment decisions.
Where an employer does not "merely articulate—but substantially establishe[s]—

34

legitimate, nondiscriminatory reasons for [the plaintiff's] discharge[,]" the plaintiff's burden in proving pretext is "rendered more difficult[.]" *Meiri*, 759 F.2d at 997.  At this point, any presumption of discrimination created by Plaintiff's *prima facie* case disappears, and Plaintiff must show that the record contains enough evidence to create a genuine issue of material fact both on the issue of pretext and the ultimate issue of discriminatory intent. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510-11 (1993).

In relying on the same facts that fail to establish a *prima facie* case, Plaintiff falls short of establishing that her termination was the product of unlawful discrimination. *See Weinstock*, 224 F.3d at 42 ("The plaintiff must produce not simply 'some' evidence, but 'sufficient['] evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the [defendant] were false, and that more likely than not [discrimination] was the real reason for the [employment action].") (internal quotation marks omitted). A rational jury could not reach a contrary conclusion. *See Viola*, 42 F.3d at 719 (affirming summary judgment where "[v]iewing all of the evidence in the light most favorable to [the plaintiff], we are convinced that no rational jury could find that [the defendant's] decision to terminate [the plaintiff] was motivated by [unlawful] bias"). Summary judgment in Defendant's favor is therefore warranted. *See Chertkova*, 92 F.3d at 86 ("No genuine issue exists if, on the basis of all the pleadings, affidavits and other papers on file, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, it appears that the evidence supporting the non-movant's case is so scant that a rational jury could not find in its favor.").

## CONCLUSION

For the foregoing reasons, the court GRANTS Defendant's motion for summary judgment (Doc. 40).

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 22nd day of April, 2016.

Christina Reiss, Chief Judge
United States District Court

36